# In the United States Court of Federal Claims

**BID PROTEST**

No. 11-533 C

(Filed Under Seal:  November 15, 2011)

(Reissued for Publication:  December 1, 2011)[*]

TO BE PUBLISHED

| | |
|---|---|
| IBM CORPORATION, U.S. FEDERAL, )<br><br>Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>SCIENCE APPLICATIONS )<br>INTERNATIONAL CORPORATION, )<br><br>and )<br><br>CACI-ISS, INC., )<br><br>and )<br><br>HP ENTERPRISE SERVICES, LLC, )<br><br>Defendant-Intervenors. )<br> ) | Post-award bid protest; agency properly evaluated strengths and weaknesses of plaintiff's proposal; agency's adjectival ratings of plaintiff's proposal were proper; agency did not introduce a new factor not described in solicitation in evaluating plaintiff's proposal for veterans involvement; agency did not engage in disparate treatment in evaluating proposals; SSA's findings of technical superiority and technical equality were rational and adequately documented; best-value analyses were unnecessary when SSA found that lower-priced proposals were technically superior or equal to plaintiff's proposal; SSA's best-value tradeoff analyses were thoroughly explained, documented, and rational; FAR 15.101-1; FAR 15.308; *Blue & Gold Fleet L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), waiver of challenge to terms of solicitation; meaningful discussions; FAR 15.306. |

---

[*] This Opinion and Order was originally filed under seal on November 15, 2011 (docket entry 65), pursuant to the protective order entered in this action on August 31, 2011 (docket entry 25). The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order.  The parties filed a Joint Status Report (docket entry 67) on November 28, 2011, proposing certain redactions. The Government made two further submissions regarding its proposed redactions (docket entries 68 and 69, Nov. 30, 2011 and Dec. 1, 2011).  The Court has adopted the redactions as finally proposed by the parties.  Accordingly, the Court is reissuing its Opinion and Order dated November 15, 2011, with those redactions indicated by three consecutive asterisks within brackets ([***]).

Jonathan D. Shaffer, Smith, Pachter, McWhorter PLC, Vienna, Va., for plaintiff.  John S. Pachter, Mary Pat Buckenmeyer, Erica J. Geibel, and Armani Vadiee, Smith, Pachter, McWhorter PLC, Vienna, Va., of counsel.  Jesse J. Williams, IBM Corporation, U.S. Federal, Bethesda, Md., of counsel.

Anuj Vohra, Trial Attorney, Christopher L. Krafchek, Trial Attorney, Kirk T. Manhardt, Assistant Director, Jeanne E. Davidson, Director, Civil Division, Commercial Litigation Branch, Tony West, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  Robert Russo, Staff Attorney, Desiree DiCorcia, Staff Attorney, Frank DiNicola, Staff Attorney, Colin Nash, Staff Attorney, Department of Veterans Affairs, Eatontown, N.J., of counsel.

James J. McCullough, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C., for defendant-intervenor Science Applications International Corporation.  Karen M. Soares and Brian M. Stanford, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C., of counsel.

Claude P. Goddard, Husch Blackwell LLP, Washington, D.C., for defendant-intervenor CACI-ISS, Inc.  Daniel J. Donohue and Sarah M. Graves, Husch Blackwell LLP, Washington, D.C., of counsel.

Richard J. Conway, Dickstein Shapiro LLP, Washington, D.C., for defendant-intervenor HP Enterprise Services, LLC.  Michael J. Slattery, Pablo A. Nichols, and Jade C. Totman, Dickstein Shapiro LLP, Washington, D.C., of counsel.

## OPINION AND ORDER

<u>GEORGE W. MILLER</u>, Judge

Plaintiff IBM Corporation, U.S. Federal ("IBM") filed a complaint against the United States alleging that the Department of Veterans Affairs ("DVA") improperly evaluated the proposal submitted by IBM in response to DVA's Request for Proposals ("RFP" or "Solicitation"), No. VA-118-10-RP-0052, and in so doing acted in a manner that was arbitrary, capricious, an abuse of discretion, and contrary to law (docket entry 1, Aug. 24, 2011).  For the following reasons, the Court **DENIES** IBM's motion for judgment on the administrative record (docket entry 46, Sept. 23, 2011), **GRANTS** defendant's motion for judgment on the administrative record (docket entry 48, Sept. 23, 2011), and **GRANTS** defendant-intervenor HP Enterprise Services, LLC's ("HP") motion for judgment on the administrative record (docket entry 45, Sept. 23, 2011).

## I.    Background

### A.    DVA's Solicitation for the T4 Program

On July 26, 2010, DVA issued an RFP for its Transformation Twenty-One Total Technology ("T4") Program.  Administrative R. ("AR") Tab 3.  The RFP sought proposals for "a total IT services solution encompassing, but not limited to software and IT products incidental to

the solution, in conjunction with all services needed to integrate a system, network, or other IT service in order to meet [DVA's] mission requirements." AR Tab 3, at 163. The Performance Work Statement described general requirements of the contract. *Id.* More specific requirements were to be defined in individual task orders to be issued during the pendency of the contract. *See id.*

The agency anticipated entering into an Indefinite Delivery/Indefinite Quantity ("IDIQ"), Multiple Award Task Order contract with a five-year period of performance. AR Tab 3, at 164. The RFP provided for a maximum selection of 15 awardees, with at least 4 contracts being awarded to Service-Disabled Veteran-Owned Small Business ("SDVOSB") firms and at least 3 being awarded to Veteran-Owned Small Business ("VOSB") firms. AR Tab 3, at 250. The ceiling value of the T4 Program was $12 billion, with a minimum $50,000 guaranteed to each awardee. AR Tab 3, at 158.

> B.    *Section M: Evaluation Factors*

The Solicitation explained that "[a]ny awards to be made will be based on the best overall (i.e., best value) proposals that are determined to be the most beneficial to the Government." AR Tab 3, at 250. To evaluate the proposals under this standard, the RFP set forth five factors: (1) technical, consisting of two sub-factors: (a) sample tasks and (b) management; (2) past performance; (3) veterans involvement; (4) small business participation commitment ("SBPC"); and (5) price. AR Tab 3, at 250–51. With regard to the weight to be assigned to each factor, the Solicitation provided that "[t]he [t]echnical factor is significantly more important than the [p]ast [p]erformance factor, which is slightly more important than the [v]eterans [i]nvolvement factor, which is of equal importance to the SBPC factor, which is slightly more important than the [p]rice factor." AR Tab 3, at 250. Additionally, when combined, factors one through four were viewed as "significantly more important" than factor five. *Id.* The RFP cautioned that "awards may not necessarily be made based upon the lowest prices offered." *Id.*

> 1.    Technical Factor

Under the sample tasks sub-factor, which was more important than the management sub-factor, AR Tab 3, at 251, offerors were to propose solutions to three sample tasks designed to be similar to task orders that would be issued under the contract. *Id.* The offerors' proposed solutions to the sample tasks were evaluated by assessing the offerors' understanding of the problems and the feasibility of each offeror's approach. *See* AR Tab 3, at 251–52. Each sample task was of equal importance. AR Tab 3, at 251.

The second technical sub-factor, management, was to be similarly evaluated, *see* AR Tab 3, at 252, to determine the offerors' understanding of the problems and the feasibility of each offeror's proposed approach. *See id.*

> 2.    Past Performance Factor

DVA also used past performance as a factor in assessing the desirability of the proposals. This evaluative factor looked at "the relative risks associated with an offeror's likelihood of success in performing the solicitation's requirements as indicated by that offeror's record of past

performance." AR Tab 3, at 252. The assessment was conducted by looking at "the quality, relevancy[,] and recency" of the offeror's and its major subcontractors' past performances. *Id.* The Solicitation specifically identified as significant to its analysis past contracts greater than $100,000 for the provision of services similar to those to be provided pursuant to the T4 Program. AR Tab 3, at 252–53. A "Past Performance Assessment Questionnaire" was attached to the Solicitation for offerors to employ when reporting past performance information. *See* AR Tab 3, at 258.

### 3.   Veterans Involvement Factor

Under the veterans involvement factor, evaluation credit was assigned to an offeror that was an SDVOSB or a VOSB firm. AR Tab 3, at 253. Offerors that were not such entities could receive evaluation credit if they "agree[d] to subcontract 10% or more of the contract value to SDVOSB concerns or 12% or more of the contract value to VOSB concerns." *Id.*

### 4.   SBPC Factor

Section M stated that "[a]ll offerors (both large and small businesses) will be evaluated on the level of small business commitment that they demonstrate for the proposed acquisition, and their prior level of commitment to utilizing small businesses in performance of prior contracts." AR Tab 3, at 253. Specifically, the agency assessed

(a) the extent to which small business firms, as defined in FAR Part 19, were "specifically" identified in proposals;

(b) "[t]he extent of commitment to use such firms (enforceable commitments [would] be weighted more heavily than non-enforceable ones)";

(c) "[t]he complexity and variety of the work" small business firms were to perform;

(d) the "realism" of the commitment to small business participation;

(e) "[p]ast performance of the offeror in complying with the requirements of the clauses at FAR 52.219-8, Utilization of Small Business Concerns, and, for all large business offerors, FAR 52.219-9, Small Business Subcontracting Plan";

(f) the extent of participation of small business firms in the value of the total acquisition;

(g) whether the offeror "me[t] the . . . overall subcontracting requirement for this procurement"—namely, that small business firms receive 35 percent of the total contract value—which was required in order to be found "acceptable" under the SBPC factor; and

(h) the extent to which the offeror met or exceeded specific subcontracting goals, namely, that SDVOSB firms receive 10 percent of the total contract value, VOSB firms receive 12 percent of the total contract value, Small Disadvantaged Business ("SDB") firms receive 5 percent of the total contract value, Women-Owned Small Business ("WOSB") firms receive 5 percent of the total contract value, and Historically Underutilized

Business Zone ("HUB Zone") small business firms receive 3 percent of the total contract value.

AR Tab 3, at 253–54.

     5.    <u>Price Factor</u>

The final evaluative factor in the agency's analysis of proposals was price. *See* AR Tab 3, at 250.

    *C.*    *Section L: Instructions, Conditions, and Notices to Offerors*

In addition to describing evaluative factors, the Solicitation contained instructions, conditions, and notices to offerors. *See* AR Tab 3, at 233–49. For example, section L.5 indicated that while SDVOSB and VOSB firms could receive "full credit" and "partial credit" for veterans involvement, respectively, non-SDVOSB and non-VOSB firms could only receive "some consideration." AR Tab 3, at 236.

Section L.7 contained proposal submission instructions. AR Tab 3, at 237. The proposal was required to be submitted in six separate volumes. Volume IV of the proposal was titled "Small Business Participation Commitment Files" and included a file for "Small Business Participation Commitment" and a file for "Small Business Subcontracting Plan." AR Tab 3, at 239. The latter was only required from large business offerors. *Id.* With respect to the file for "Small Business Participation Commitment," Section L.7 explained how to address criteria (a) through (e) of the SBPC factor. *See* AR Tab 3, at 242; *see also supra* Part I.B.4. For example, with respect to criterion (b), which stated that DVA would consider the extent of commitment to use small business firms and weigh enforceable teaming agreements more heavily, an offeror was instructed: "To demonstrate this element, list any small business subcontractors with which you have teaming agreements for this solicitation and indicate whether they are bilateral, unilateral, long term relationships or mentor protégé arrangements." AR Tab 3, at 243.

    *D.*    *IBM's Response to the Solicitation*

On August 31, 2011, IBM, designated as offeror 47, submitted its initial proposal in response to the Solicitation. *See* AR Tab 18. Among other aspects,[1] IBM's proposal indicated that it would subcontract approximately [\*\*\*] percent of the contract value to small business firms, exceeding DVA's 35-percent requirement. *See* AR Tab 18, at 24257. IBM's proposal also indicated that it would exceed DVA's subcontracting goals with regard to specific types of small business firms: SDB ([\*\*\*] percent proposed versus 5 percent goal), WOSB ([\*\*\*] percent proposed versus 5 percent goal), HUB Zone ([\*\*\*] percent proposed versus 3 percent goal), VOSB ([\*\*\*] percent proposed versus 12 percent goal), and SDVOSB ([\*\*\*] percent proposed versus 10 percent goal). *See* AR Tab 18, at 24257–58.

---

[1] The Court describes the content of IBM's proposal in more detail in Part I.F, which deals with the Final Evaluation Report.

   E.   *Initial Evaluation, Initial Competitive Range, Items for Negotiation, Interim
        Proposal, Final Competitive Range, and Final Revisions*

The Source Selection Evaluation Board ("SSEB") conducted initial evaluations and the Source Selection Authority ("SSA") established an initial competitive range, consisting of proposals from 22 offerors, one of which was IBM. *See* AR Tab 135. DVA then released Items for Negotiation ("IFNs") to each of the 22 offerors that had submitted proposals in the initial competitive range. *See* AR Tabs 136–57. With respect to IBM's proposal, DVA identified five IFNs. *See* AR Tab 149. IBM, along with other offerors that had submitted proposals that were found to be in the initial competitive range, responded with a first revised proposal ("interim proposal") addressing the concerns raised in the IFNs. *See* AR Tab 172.

In March 2011, the SSA determined a final competitive range consisting of proposals from 21 offerors, which included IBM. *See* AR Tab 204. IBM was then permitted to revise any part of its proposal a final time, although it declined to do so. *See* AR Tabs 235, 249.

   F.   *Final Evaluation Report*

      1.   <u>Technical Factor</u>

The offerors' technical proposals were assessed for understanding, detail, feasibility, and risk. AR Tab 2, at 131. The Source Selection Evaluation Plan ("SSEP") provided that the rating for the technical factor and both sub-factors would be expressed as an adjectival assessment of "outstanding," "good," "acceptable," or "unacceptable."[2] *Id.* To be considered for an award, the Solicitation provided that an offeror's proposal was required to receive a rating of "acceptable" for the technical factor and both technical sub-factors. AR Tab 3, at 250.

The definition of "outstanding" was "[a] proposal that satisfies all of the Government's requirements, contains extensive detail, demonstrates a thorough understanding of the problems, and is highly feasible (low risk) in meeting the Government's requirements." AR Tab 2, at 131. "Good" was defined as "[a] proposal that satisfies all of the Government's requirements, contains adequate detail, demonstrates an understanding of the problems, and is feasible (low to moderate degree of risk) in meeting the Government's requirements." *Id.* "Acceptable" meant "[a] proposal that satisfies all of the Government's requirements, contains minimal detail, demonstrates a minimal understanding of the problems, and is minimally feasible (moderate to high degree of risk) in meeting the Government's requirements." *Id.* The foregoing definitions of "outstanding," "good," and "acceptable" were used in the evaluation of the technical sub-factors of sample tasks and management. The rating for the technical factor was a "roll up" of the technical sub-factor ratings. *Id.* (internal quotation marks omitted).

In addition to ratings for factors and sub-factors, an offeror could receive "strengths" and "weaknesses." The SSEP defined "strength" as "[a]ny aspect of a proposal that, when judged against a stated evaluation criterion, enhances the merit of the proposal or increases the

---

[2] The Court has omitted original capitalization in quotations from the administrative record regarding ratings for the factors and sub-factors.

probability of successful performance of the contract.  A ['']significant strength['] appreciably enhances the merit of a proposal or appreciably increases the probability of successful contract performance."  AR Tab 2, at 133.  "Weakness" was defined as follows: "A flaw in a proposal that increases the risk of unsuccessful contract performance.  A [']significant weakness['] in a proposal is a flaw that appreciably increases the risk of unsuccessful contract performance."  *Id.*

Here, IBM's proposal received a technical factor rating of "[***]" and ratings of "[***]" for the sample tasks and management sub-factors.  AR Tab 270, at 82662.  IBM's proposal received an "[***]" rating for sample task 1: "The offeror received a rating of [***] since the proposal satisfies all of the Government's requirements, contains minimal detail, demonstrates a minimal understanding of the problems, and is minimally feasible ([***]) in meeting the Government's requirements."  AR Tab 270, at 82669.  DVA found one significant strength and one strength.  Two weaknesses were found with IBM's proposal for sample task 1.  AR Tab 270, at 82667–69.

With respect to sample task 2, IBM's proposal received a rating of "[***]": "The offeror received a rating of [***] since the proposal satisfies all of the Government's requirements, contains minimal detail, demonstrates a minimal understanding of the problems, and is minimally feasible ([***]) in meeting the Government's requirements."  AR Tab 270, at 82673.  DVA found two significant strengths, one strength, one weakness, and two significant weaknesses.  AR Tab 270, at 82670–73.

IBM's proposal received an "[***]" rating for sample task 3 "since the proposal satisfies all of the Government's requirements, contains extensive detail, demonstrates a thorough understanding of the problems, and is highly feasible ([***]) in meeting the Government's requirements."  AR Tab 270, at 82676.  IBM's proposal received one significant strength and three strengths.  AR Tab 270, at 82674–75.

DVA rated IBM's proposal as "[***]" with respect to the management sub-factor "since the proposal satisfies all of the Government's requirements, contains adequate detail, demonstrates an understanding of the problems and is feasible ([***]) in meeting the Government's requirements."  AR Tab 270, at 82681.  IBM's proposal received three significant strengths and one strength.  AR Tab 270, 82679–80.

2.   Past Performance Factor

A proposal could receive a rating of "high risk," "moderate risk," "low risk," or "unknown risk" for the past performance factor.  AR Tab 2, at 132.  "Low risk" was defined in the SSEP as "[l]ittle doubt exist[ing], based on the offeror's performance record, that the offeror can perform the proposed effort."  *Id.*

Here, DVA rated IBM's proposal as "[***]" for past performance.  AR Tab 270, at 82658.  The Final Evaluation Report shows that IBM's proposal indicated that it had 11 major subcontractors and 38 recent and relevant past performances.  *Id.*  IBM's proposal was evaluated for specific performance issues and overall performance, commitment to and concern for customers, and controlling costs.  *Id.*  IBM's proposal provided 240 questionnaire responses, with [***] percent being "exceptional," [***] percent being "satisfactory," and [***] percent

being "not applicable."  *Id.*  With respect to other sources of past performance information, DVA reviewed the Past Performance Informational Retrieval System for IBM's proposed team and found 16 recent and relevant past performance records, none of which contained adverse information.  AR Tab 270, at 82659.

3.     SBPC Factor

The SBPC factor was evaluated for commitment to small business participation, detail, and feasibility, the latter of which included risk.  AR Tab 2, at 132.  A proposal could receive an adjectival rating of "outstanding," "good," "acceptable," or "unacceptable."  *Id.*  To be considered for an award, the Solicitation provided that an offeror's proposal was required to receive a rating of at least "acceptable" for the SBPC factor.  AR Tab 3, at 250.

"Outstanding" meant "[a] proposal that demonstrates a strong level of commitment to small business participation, contains extensive detail, and is highly feasible (low risk)."  AR Tab 2, at 132.  "Good" was defined as "[a] proposal that demonstrates an adequate level of commitment to small business participation, contains adequate detail, and is at least feasible (low to moderate risk)."  *Id.*  "Acceptable" meant "[a] proposal that demonstrates a minimal commitment to small business participation, contains minimal detail, and is at least feasible (moderate to high risk)."  *Id.*

Here, DVA rated IBM's proposed SBPC as "[***]," explaining: "Offeror 047 provides a proposal that demonstrates a strong level of commitment to small business participation, contains adequate detail, and is at least feasible with low risk."  AR Tab 270, at 82661.  DVA found five strengths because IBM's proposal exceeded DVA's subcontracting goals with respect to SDB, WOSB, HUB Zone small business, VOSB, and SDVOSB firms; a strength for the bilateral teaming agreements with 4 of the 24 proposed small business subcontractors; a strength for the mentor-protégé agreement with a proposed small business subcontractor; a strength for the complexity and variety of the work to be performed by small business subcontractors; and a strength for IBM's extensive lists and supplier databases to ensure small business goals were met.  AR Tab 270, at 82660–61.

IBM's proposal did *not* receive a strength for its 20 unilateral teaming agreements with small business subcontractors.  *See* AR Tab 18, at 24247.  IBM's proposal also did *not* receive a strength for its "dedicated IDIQ center of excellence that manages several IDIQ vehicles, including small business participation."  AR Tab 18, at 24255.

As required of large business offerors, IBM's proposal included a "Small Business Subcontracting Plan" file in Volume IV.  *See* AR Tab 18, at 24260.  In this file, IBM's proposal identified small business awards and an employee dedicated to small business subcontracting coordination, but IBM's proposal did not receive strengths for these aspects of its proposal.

4.     Veterans Involvement Factor

The SSEP indicated that the ratings for veterans involvement were "full credit," "partial credit," "minor credit," and "no credit."  AR Tab 2, at 133.  "Minor credit" meant that "[t]he Offeror is neither a[n] SDVOSB nor [a] VOSB but has provided an acceptable subcontracting

plan in which SDVOSB or VOSBs are subcontracted 10% and 12% respectively or more of the contract value." *Id.*

Here, IBM's proposal received "minor credit" for veterans involvement because IBM was not an SDVOSB or a VOSB firm, but had agreed to subcontract [***] percent of the total contract value to SDVOSB firms and [***] percent to VOSB firms,[3] exceeding DVA's goals. AR Tab 270, at 82682.

     5.    <u>Price</u>

The Final Evaluation Report indicated that IBM's proposed price was approximately [***] billion.  AR Tab 270, at 82655.

    *G.*    *Source Selection Decision Document*

A color-coded[4] table in the Source Selection Decision Document ("SSD document") sets forth the final ratings, risks, and prices of the final proposals from the 21 offerors in the final competitive range.[5]  *See* AR Tab 280, at 83096–97.  The Court has re-created the table below to account for the fact that the copy of the table in the administrative record is not in color:

---

[3] A subcontractor could be both an SDVOSB and a VOSB firm, which explains why IBM's proposed percentages exceeded 100 percent.

[4] The Source Selection Decision Document does not actually include a code indicating the meaning of the colors.  However, the intended meaning of each color is not disputed by the parties.

[5] As noted earlier, IBM was offeror 47.

| Offeror | Technical Factor | Sample Tasks Sub-Factor | Sample Task 1 | Sample Task 2 | Sample Task 3 | Mgmt. Sub-Factor | Past Performance Factor | SBPC Factor | Veterans Involvement Factor | Price in Billions ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Green | Green | Yellow H | Blue L | Yellow H | Yellow M | Blue | Blue | Blue | 9.819 |
| 3 | Yellow | Yellow | Red VH | Green L-M | Yellow M | Green L | Blue | Blue | Green | 7.619 |
| 7 | Green | Green | Yellow M-H | Blue L | Green L | Green M | Blue | Green | Yellow | 6.87 |
| 8 | Blue | Blue | Blue L | Blue L | Green L | Blue L | Blue | Blue | Yellow | 8.655 |
| 9 | Yellow | Yellow | Green L-M | Yellow L | Yellow H | Yellow M | Blue | Yellow | Blue | 7.265 |
| 10 | Blue | Blue | Blue L | Blue L | Green L-M | Green L-M | Blue | Green | Yellow | 7.19 |
| 15 | Green | Green | Green L-M | Yellow M | Green L | Green L-M | Blue | Green | Yellow | 8.199 |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| 37 | Yellow | Yellow | Yellow H | Yellow M-H | Yellow M-H | Green L-M | Blue | Yellow | Blue | 9.408 |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| 41 | Green | Green | Blue L | Green L-M | Green L-M | Blue L | Blue | Blue | Yellow | 9.088 |
| 45 | Green | Green | Green L | Yellow L | Green L-M | Green L-M | Blue | Green | Yellow | 7.464 |
| 47 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| 49 | Green | Green | Yellow M | Yellow M | Blue L | Green M | Blue | Yellow | Blue | 8.47 |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| 81 | Green | Green | Yellow M | Green L | Green L-M | Green L | Blue | Yellow | Yellow | 7.809 |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| 90 | Green | Green | Green M | Green L-M | Green L-M | Yellow M | Blue | Yellow | Blue | 7.619 |
| 91 | Green | Green | Green M | Green L | Green L-M | Green L-M | Blue | Yellow | Yellow | 6.833 |
| 95 | Yellow | Yellow | Yellow M | Yellow M-H | Yellow H | Yellow M | Blue | Yellow | Blue | 8.811 |

With respect to the technical factor, the table set forth the adjectival ratings for the technical factor, adjectival ratings for the sample tasks sub-factor, adjectival ratings for the individual sample tasks and the risk associated with each sample task (low, low-to-moderate, moderate, moderate-to-high, high, and very high), and adjectival ratings for the management sub-factor and the risk associated with the management proposal.  Adjectival ratings were indicated by color, with blue representing "outstanding," green representing "good," yellow representing "acceptable," and red representing "unacceptable."

With respect to the past performance factor, the table indicated the degree of risk.  Blue represented "low risk."  With respect to the SBPC factor, the table indicated the adjectival ratings.  Blue represented "outstanding," green represented "good," and yellow represented "acceptable."

With respect to veterans involvement, the table indicated the amount of credit a proposal was awarded.  Blue represented "full credit," green represented "partial credit," and yellow represented "minor credit."  Finally, the table indicated the price in billions of dollars.

The SSA stated:

> Based upon the findings of the [SSEB] and the Source Selection Advisory Council (["]SSAC["]) as presented to me on March 24, 2011, I compared the proposals, giving appropriate consideration to the evaluation criteria set forth in the solicitation and their relative importance.  Based on this comparison, I have determined that the proposals submitted by Offerors 7 [(ASM Research Inc.)], 8 [(Booz Allen Hamilton Inc.)], 10 [(CACI-ISS, Inc.)], 15 [(Creative Computing Solutions, Inc.)], 41 [([Harris Corporation)], 45 [(HP)], 81 [(Science Applications International Corporation)], 90 [(Systems Made Simple, Inc.)], and 91 [(SRA International, Inc.)] are the best overall proposals and most beneficial to the Government.  All of these offerors, with the exception of Offeror 90 [(Systems Made Simple, Inc.)], are non-SDVOSB/VOSB concerns.  They constitute the awards to be made in the first step (open competition awards) of the award determination process as set forth in the solicitation.

> These award determinations are based on the relative importance of the evaluation factors, the SSEB's detailed evaluation of each of the offerors' proposals and the comparative analysis of the evaluation results reflected in the attachments to this [SSD document].

AR Tab 280, at 83097.  The SSA's reference to the briefing she received appears to refer to briefing documents that are in the administrative record.  *See* AR Tab 279.  These documents contain more information about each proposal than is contained in the table prepared by the SSA.

The SSA then went on to set forth her conclusion that the proposals from the nine offerors identified above represented the best value to DVA.[6]

In addition to the nine proposals selected at step one, the SSA also selected proposals at step two in the source selection process.  However, IBM's proposal was not eligible to be selected because IBM was not an SDVOSB or a VOSB firm.  *See* AR Tab 3, at 251.

>    H.    *Instant Action*

On August 24, 2011, IBM filed the instant action.  In its complaint, IBM alleges that DVA (1) conducted an unreasonable evaluation of IBM's proposed SBPC, Compl. ¶¶ 34–51; (2) conducted an unreasonable evaluation of IBM's proposed veterans involvement, *id.* ¶¶ 52–57; (3) improperly evaluated the other offerors' proposed prices, *id.* ¶¶ 58–64; (4) improperly evaluated IBM's technical proposal, *id.* ¶¶ 65–77; (5) failed to conduct meaningful discussions with IBM, *id.* ¶¶ 78–82; and (6) improperly determined the proposals that represented the best value to DVA.  *Id.* ¶¶ 83–89.

IBM filed a motion for judgment on the administrative record.  Defendant and defendant-intervenor HP (offeror 45) filed cross-motions for judgment on the administrative record.  Defendant and defendant-intervenors HP, CACI-ISS, Inc. ("CACI") (offeror 10), and Science Applications International Corporation ("SAIC") ([***]) filed responses in opposition to IBM's motion (docket entries 52, 54–55, 57, Oct. 7, 2011).  IBM filed a response in opposition to defendant's and defendant-intervenor HP's cross-motions for judgment on the administrative record (docket entry 58, Oct. 7, 2011).  IBM, defendant, and defendant-intervenors HP and SAIC filed replies (docket entries 60–63, Oct. 14, 2011).  On October 21, 2011, the Court heard oral argument on the motions.

## II.    Analysis

The parties filed cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims.  In a bid protest action, the Court will set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see* 28 U.S.C. § 1491(b)(4); *Banknote Corp. of Am. Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  The protestor will succeed when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Banknote Corp. of Am.*, 365 F.3d at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)) (internal quotation marks omitted).  The protestor must show that the agency failed to provide a "coherent and reasonable explanation of its exercise of discretion" or that there was a "clear and prejudicial violation of applicable statutes or regulations."  *Id.* (quoting *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1332–33) (internal quotation marks omitted).  To demonstrate prejudice in a post-award protest, the protestor "must show that there

---

[6] In this Opinion and Order, the Court will refer to these nine offerors as follows: 7 (ASM Research), 8 (Booz Allen), 10 (CACI), 15 (CCSI), 41 (Harris), 45 (HP), 81 ([***]), 90 (Systems Made Simple), and 91 (SRA International).

was a 'substantial chance' it would have received the contract award absent the alleged error." *Banknote Corp. of Am.*, 365 F.3d at 1351 (quoting *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001)).

The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. *DynCorp Int'l v. United States*, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion," *id.* (quoting *Burroughs Corp. v. United States*, 617 F.2d 590, 598 (Ct. Cl. 1980)) (internal quotation marks omitted); "best value" awards afford the contracting officer additional discretion. *Id.* Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." *Id.*

In reviewing cross-motions for judgment on the administrative record, the Court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot. v. United States*, 72 Fed. Cl. 126, 131 (2006). In a manner "akin to an expedited trial on 'the paper record,'" the Court will make findings of fact where necessary. *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007) (quoting *A & D Fire Prot.*, 72 Fed. Cl. at 131).

A.   *DVA Properly Evaluated IBM's Proposed SBPC*

1.   That DVA Did Not Find Any Significant Strengths or Additional Strengths for IBM's SBPC Was Rational

The assignment of ratings is within the broad discretion of the contracting officer. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (noting that matters such as technical ratings "involve discretionary determinations of procurement officials that a court will not second guess"); *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 740 (2008) ("A protestor's mere disagreement with an evaluation does not provide an adequate basis to overturn the agency's decision.").

Here, IBM's proposal received numerous strengths, although no significant strengths. *See* AR Tab 270, at 82660–61. The majority of IBM's argument with respect to its proposal's entitlement to significant strengths and additional strengths amounts only to disagreement with DVA's evaluation of IBM's SBPC, which is not a sufficient basis to overturn the evaluation. *See Femme Comp Inc.*, 83 Fed. Cl. at 740; *see, e.g.*, Pl.'s Mot. 12 (arguing that "IBM should have received the highest credit" for the complexity and variety of the work small firms were to perform under its proposal).

2.   DVA Did Not Introduce a New Factor by Affording Greater Weight to Bilateral Teaming Agreements with Small Business Subcontractors, as Opposed to Unilateral Teaming Agreements

IBM proposed 4 bilateral teaming agreements with small business subcontractors and 20 unilateral teaming agreements. *See* AR Tab 18, at 24247. IBM received a strength for the four bilateral teaming agreements. *See* AR Tab 270, at 82660. IBM did not receive a significant strength or strength for its unilateral teaming agreements. Other offerors received a significant strength when *all* of their teaming agreements with small business subcontractors were bilateral.

*See, e.g.*, AR Tab 261, at 82400; AR Tab 268, at 82604.  IBM argues that DVA introduced a new evaluation factor not set forth in the Solicitation, specifically whether the teaming agreements were unilateral or bilateral, and was required to limit itself to considering whether a teaming agreement was enforceable pursuant to 41 U.S.C. § 3701(a) and FAR 15.305(a).  *See* Pl.'s Mot. 16–18.

With respect to SBPC, section M stated that DVA would consider "[t]he extent of commitment to use such firms (*enforceable commitments will be weighted more heavily than non-enforceable ones*)."  AR Tab 3, at 253 (emphasis added).  Section L explained:  "To demonstrate this element, list any small business subcontractors with which you have teaming agreements for this solicitation and indicate whether they are *bilateral*, *unilateral*, long term relationships or mentor protégé arrangements."  AR Tab 3, at 243 (emphasis added).  In light of the language in sections M and L, the Court rejects IBM's argument that DVA introduced a new factor into its evaluation by only affording a significant strength when all of the teaming agreements were bilateral, i.e., were enforceable commitments.

Moreover, in making this argument IBM appears to challenge the terms of the Solicitation.  Specifically, IBM appears to take issue with the fact that the Solicitation did not define bilateral or unilateral contracts[7] or better explain how DVA would take into consideration the type of teaming agreement in determining an offeror's level of commitment to small business participation.  To the extent IBM challenges the terms of the Solicitation, IBM waived this challenge by not raising it earlier.  *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007) (recognizing "a waiver rule against parties challenging the terms of a government solicitation").

3.     DVA Did Not Conduct a Disparate Evaluation of IBM's Proposal

Agencies "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria."  *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 383 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).  IBM argues that DVA engaged in disparate treatment by failing to award it significant strengths for its (1) "dedicated IDIQ center of excellence that manages several IDIQ vehicles, including small business participation," (2) small business awards, and (3) employee dedicated to small business coordination.  Pl.'s Mot. 18–20.  IBM claims disparate treatment based on DVA's awarding significant strengths to, *inter alia*, offeror 8 (Booz Allen) for an employee dedicated to small business coordination and small business awards and to offeror 41 (Harris) for a supplier diversity program responsible for soliciting small businesses and small business awards.  *Id.* (citing AR Tab 261, at 82400; AR Tab 268, at 82604).

---

[7] Black's Law Dictionary defines a unilateral contract as "[a] contract in which only one party makes a promise or undertakes a performance; a contract in which no promisor receives a promise as consideration for the promise given."  Black's Law Dictionary 374 (9th ed. 2009); *see also* Def.'s Opp'n 8 ("[The] [e]ssence of a 'unilateral contract' is that neither party is bound until the promisee accepts the offer by performing the proposed act[.]" (quoting Black's Law Dictionary 325 (6th ed. 1990))) (alterations in original) (internal quotation marks and emphasis omitted).

As an initial matter, defendant correctly points out that no other offerors received recognition for IDIQ centers of excellence and thus that cannot be a basis for disparate treatment. *See* Def.'s Opp'n 9 n.2.  IBM is correct that other offerors received credit for employees dedicated to small business participation and small business awards.  Nonetheless, IBM failed to include this information in the correct portion of its proposal, and DVA was not required to search for additional information to assist IBM.  *Cf. Hi-Tec Sys., Inc.*, B-402590 *et al.*, 2010 WL 2799417, at *2 (Comp. Gen. June 7, 2010) ("[W]e do not think the agency was required to search the other volumes of Hi-Tec's proposal for information bearing on the identified weaknesses.").  IBM included the information at issue in its "Small Business Subcontracting Plan," the second file in Volume IV, which the Solicitation did not indicate would be evaluated for purposes of an award of a contract and which small business offerors were not required to submit.  *See* AR Tab 3, at 252 (section M.2.C.4); AR Tab 3, at 237, 242–47 (section L.7.2.c and section L.7.2.c(iv)).  If IBM wanted the information to be considered, IBM should have included it in the first file of Volume IV, titled "Small Business Participation Commitment," as other offerors did.[8]

4.    <u>That DVA Rated IBM's Proposal as [***] with Respect to SBPC Was Rational</u>

IBM's argument that it deserved a rating of "outstanding" for SBPC is primarily based on its argument that it deserved significant strengths or additional strengths or that DVA introduced a new factor, arguments the Court has rejected above.  Moreover, the rating for SBPC was based only in part on the level of commitment to small business participation.  AR Tab 2, at 132.  The SBPC evaluation also considered the level of detail and feasibility.  *Id.*  The Final Evaluation Report for IBM's proposal stated that IBM "provides a proposal that demonstrates a strong level of commitment to small business participation, *contains adequate detail*, and is at least feasible with low risk."  AR Tab 270, at 82661 (emphasis added).  IBM has not demonstrated to this Court that DVA acted irrationally in finding the level of detail only adequate, as opposed to "extensive," as required for a rating of "outstanding."  AR Tab 2, at 132.  Accordingly, IBM's claim that it deserved an "outstanding" rating for the SBPC factor must fail.

B.    *DVA Properly Evaluated IBM's Proposed Veterans Involvement*

IBM strenuously challenges DVA's only affording IBM "minor credit" in evaluating the veterans involvement factor, despite the fact that "IBM's veteran subcontracting totals amounted to approximately [***] of the entire contract value."  Pl.'s Mot. 20.  Nonetheless, section L explained that, while SDVOSB and VOSB firms could receive "full credit" or "partial credit," respectively, for veterans involvement, non-SDVOSB and non-VOSB firms could only receive

---

[8] The Court recognizes that DVA considered offeror 15's (CCSI) "Small Business Subcontracting Plan" when evaluating its "Small Business Participation Commitment." However, as acknowledged by IBM, *see* Pl.'s Reply 11, offeror 15 (CCSI) expressly incorporated the "Small Business Subcontracting Plan" file when addressing three of the criteria that the Solicitation stated would be considered in evaluating SBPC.  *See, e.g.*, AR Tab 11, at 11784 ("Element F is provided in the Small Business Subcontracting Plan document entitled, Creative Computing Solutions, Inc. (CCSi)_SBSP.").

"some consideration."  AR Tab 3, at 236.  "Some consideration" was described as "minor credit" in the SSEP.  *See* AR Tab 2, 133.  Thus, DVA properly evaluated IBM's veterans involvement proposal.  Moreover, to the extent IBM is challenging the terms of the Solicitation, such as the term limiting credit to "minor credit" for non-veteran offerors, that challenge is waived pursuant to *Blue & Gold*, 492 F.3d at 1313.

> C.      *IBM Has Not Shown that DVA Improperly Evaluated IBM's Technical Proposal or Other Offerors' Price Proposals*

The Court agrees with defendant and defendant-intervenor HP that IBM appears to have abandoned its claims regarding improper evaluation of technical and price proposals.  *See* Def.'s Reply 3–5; Def.-Intervenor HP's Opp'n 10.  To the extent IBM stands by its claims, the Court finds that IBM has not met its burden.

> D.      *The SSA's Best-Value Determinations Were Explained and Documented Consistent with FAR 15.308*

The best-value tradeoff process is described in FAR 15.101-1: "This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal.  The . . . rationale for tradeoffs must be documented in the file in accordance with 15.406."  FAR 15.101(c).  As noted earlier, in a negotiated, best-value procurement, the "protestor's burden is especially heavy."  *DynCorp Int'l*, 76 Fed. Cl. at 537.

FAR 15.308 addresses the role of the SSA.  First, the SSA's "decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation."  FAR 15.308.  Second, the "decision shall represent the SSA's independent judgment."  *Id.*  Third, the decision shall be documented, and the documentation "shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs," although any tradeoffs need not be quantified.  *Id.*

The court in *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 496 (2008), thoroughly explained the requirements of the regulations, creating "a skeletal framework" of the inquiry.  "First, the regulation requires the agency to make a business judgment as to whether the higher price of an offer is worth the technical benefits its acceptance will afford."  *Id.*  An agency must "do more than simply parrot back the strengths and weaknesses of the competing proposals— rather, the agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price."  *Id.* at 497.  "Second, in performing the tradeoff analysis, the agency need neither assign an exact dollar value to the worth associated with the technical benefits of a contract nor otherwise quantify the non-cost factors.  But . . . logic suggests that as that magnitude increases, the relative benefits yielded by the higher-priced offer must also increase."  *Id.* (citation omitted).  Third, the agency must document its tradeoff analysis.  *Id.*  "Conclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise."  *Id.*

The SSA need not conduct a best-value analysis for every proposal.  "[W]here proposals are technically equal, a best-value tradeoff analysis between price and technical

factors is not required.  A best-value tradeoff analysis is not required because under such circumstances . . . a best-value tradeoff is not possible." *Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 349 (2009) (citing *Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 635 n.26 (2005)).  The reason a best-value tradeoff is not possible is "[n]o amount of agency reasoning could justify selecting a higher-priced proposal, where a lower-priced and technically equal proposal is available." *Id.*

IBM alleges three grounds on which the best-value determinations were improper, challenging the nine awards made at step one of the source selection process, consisting of eight awards to large business offerors and one award to an SDVOSB offeror: "[t]he best value determination was materially erroneous because the agency (1) relied upon the improper evaluation under the [SBPC] and [v]eterans [i]nvolvement factors; (2) gave undue weight to price; and (3) failed to properly consider the strengths and weaknesses of offerors' proposals." Pl.'s Mot. 24.  IBM makes numerous arguments in support of each of these three primary claims.  *See* Pl.'s Mot. 24–32; Pl.'s Opp'n 16–22; Pl.'s Reply 13–18.

> ### 1.   The SSA Did Not Conduct Improper Evaluations of SBPC and Veterans Involvement

To the extent IBM seeks to overturn the SSA's selection of any of the awards at step one of the source selection process based on its claims that DVA improperly evaluated SBPC and veterans involvement, the Court has previously rejected those contentions.

> ### 2.   The SSA Did Not Give Undue Weight to Price

IBM specifically argues that DVA "(1) considered only the [t]echnical and [p]rice factors when analyzing proposals for best value; and (2) weighted the [p]rice factor equal to the [t]echnical factor." Pl.'s Mot. 26.  With respect to the proposals from offerors 8 (Booz Allen) and 41 (Harris), the SSA conducted best-value analyses to determine whether their technical superiority was worth a price higher than IBM's price.[9]  *See* AR Tab 280, at 83103–08, 83124–28.

The Court rejects IBM's argument that undue weight was given to price in these two best-value analyses for a number of reasons.  The best-value analyses attached to the SSD document with respect to proposals from IBM and offerors 8 (Booz Allen) and 41 (Harris) compared their SBPC, past performance, and veterans involvement.  *See* AR Tab 280, at 83103–08, 83124–28.  Moreover, at the outset of the SSD document, the SSA stated: "Based upon the

---

[9] Because offerors 8's (Booz Allen) and 41's (Harris) proposals were higher-priced and technically superior to IBM's proposal, the SSA was required to conduct best-value analyses to determine whether to select those two proposals over IBM's proposal.  However, as noted below, the SSA was not required to conduct best-value analyses with respect to the proposals from IBM and the seven offerors other than offerors 8 (Booz Allen) and 41 (Harris) that were selected at step one because the SSA found that the proposals submitted by the seven others were lower-priced and technically superior or equal to IBM's proposal.  *See infra* Part II.D.3.a.

findings of the [SSEB] and the [SSAC] as presented to me on March 24, 2011, I compared the proposals, giving appropriate consideration to the evaluation criteria set forth in the solicitation and their relative importance." AR Tab 280, at 3097. The SSA also stated: "These award determinations are based on the relative importance of the evaluation factors, the SSEB's detailed evaluation of each of the offerors' proposals and the comparative analysis of the evaluation results reflected in the attachments to this [SSD document]." *Id.* Thus, the Court rejects the claim that the SSA only considered the technical and price factors and weighted the price factor equal to the technical factor.

  3.  The SSA Properly Evaluated Strengths and Weaknesses of Offerors'
      Proposals

    a.  The SSA's Findings of Technical Superiority and Equality Were
        Rational and Adequately Documented

In order to conduct a best-value analysis, the SSA was required to find that the proposals were both lower-priced and technically superior or equal to IBM's proposal. *See Carahsoft*, 86 Fed. Cl. at 349 ("No amount of agency reasoning could justify selecting a higher-priced proposal, where a lower-priced and technically equal proposal is available."). The SSA concluded that proposals from seven of the nine offerors that were selected at step one were lower-priced and technically superior or equal to IBM's proposal. These seven proposals were submitted by offerors 7 (ASM Research), 10 (CACI), 15 (CCSI), 45 (HP), 81 ([***]), 90 (Systems Made Simple), and 91 (SRA International).[10] *See* AR Tab 280, at 83097–98. IBM has challenged the SSA's findings of technical superiority and equality with respect to these seven lower-priced proposals, one of which was submitted by an SDVOSB—offeror 90 (Systems Made Simple).

An SSA's finding that certain proposals are technically equal is entitled to "great weight." *See, e.g.*, *Moorman's Travel Serv., Inc.-Request for Reconsideration*, B-219728 *et al.*, 1985 WL 57072, at *5 (Comp. Gen. Dec. 10, 1985). Absolute equality is not required to find technical equality. *See Consol. Eng'g Servs.*, 64 Fed. Cl. at 638 ("[S]he needed only to determine that the proposals 'were essentially equal as to all noncost factors.'" (quoting *SAMS El Segundo, LLC*, B-291620, 2003 WL 1055212, at *13 (Comp. Gen. Feb. 3, 2003)); *Alturdyne*, B-214103 *et al.*, 1984 WL 46723, at *1 (Comp. Gen. Oct. 2, 1984).

---

[10] The SSA *expressly* stated that the proposals from offerors 7 (ASM Research), 10 (CACI), 45 (HP), 90 (Systems Made Simple), and 91 (SRA International) were lower-priced and technically superior to IBM's proposal. *See* AR Tab 280, at 83097. The SSA also *expressly* stated that the proposal from offeror 15 (CCSI) was lower-priced and technically equal to IBM's proposal. *See* AR Tab 280, at 83098. While the SSA did not expressly state that offeror 81's ([***]) lower-priced proposal was technically superior or equal to IBM's proposal, the Court finds that this determination was necessarily included in the SSA's selection of offeror 81's ([***]) proposal over IBM's proposal. *See* AR Tab 280, at 83097 ("Based on this comparison, I have determined that the proposals submitted by Offerors 7 [(ASM Research)], 8 [(Booz Allen)], 10 [(CACI)], 15 [(CCSI)], 41 [(Harris)], 45 [(HP)], 81 [([***])], 90 [Systems Made Simple], and 91 [(SRA International)] are the best overall proposals and most beneficial to the Government.").

The sufficiency of the documentation of a finding of technical superiority or equality depends on the record supporting the finding; for example, conclusory statements of superiority or equality are insufficient when the record reflects differences in technical merit between a protestor's proposal and the selected proposal. *See Magellan Health Servs.*, B-298912, 2007 WL 1469049, at *15 (Comp. Gen. Jan. 5, 2007) ("Notwithstanding the fact that Magellan's FPR was scored higher than Ceridian's FPR, as documented by the TEP, the source selection decision is devoid of any discussion as to how, or even if, the contracting officer determined before award that the offerors' proposals were technically equal."); *Johnson Controls World Servs., Inc.*, B-289942 *et al.*, 2002 WL 1162912, at *10 (Comp. Gen. May 24, 2002) ("Where, as here, the evaluation record evidences relative differences in proposal merit, general statements of equivalency are inadequate to show equivalency; the agency must compare the relative merits of the proposals in a manner that reasonably supports a determination of equivalency."); *The Jonathan Corp.*, B-199407 *et al.*, 1982 WL 27712, at *4 (Comp. Gen. Sept. 23, 1982) ("We have held that in explaining the basis for a determination that competing technical proposals are essentially equal, procuring agencies may not rely on bare conclusory statements, but must provide factual explanation as to why the proposals are perceived as essentially equal. . . . However, the amount of factual explanation provided regarding technical equality . . . will, of course, vary from case to case depending on the circumstances."), *aff'd on reh'g*, B-199407 *et al.*, 1982 WL 27561, at *1 (Comp. Gen. Nov. 17, 1982) ("[W]e see no merit in the contention that the contracting officer was obligated to record why the proposals were scored technically equal aside from a mere point score comparison.").

Here, as a threshold matter, the Court finds that the SSA sufficiently documented her findings of technical superiority and equality.  The Court recognizes that the SSA stated in a conclusory fashion that she compared all proposals.  AR Tab 280, at 83097.  She later stated in a conclusory fashion that the proposals from offerors 7 (ASM Research), 10 (CAIC), 45 (HP), 90 (Systems Made Simple) and 91 (SRA International) were technically superior.  AR Tab 280, at 83097.  She also made such a conclusory statement with respect to the technical equality of the proposals from IBM and offeror 15 (CCSI).  AR Tab 280, at 83098.  She failed to make even a conclusory statement of technical equality with respect to IBM's and offeror 81's ([***]) proposals, although a finding of technical equality was necessarily implied.  *See supra* note 10.

In addition to conclusory statements, the SSA alluded in her decision to the color-coded table, *see supra* Part I.G, identifying the ratings of the 21 proposals in the final competitive range for the technical factor, sample tasks technical sub-factor, individual sample tasks, management technical sub-factor, past performance factor, SBPC factor, and veterans involvement factor. The SSD document also appears to refer to certain briefing documents that contained greater detail relating to the final evaluation reports.  AR Tab 280, at 83097; *see also* AR Tab 279.

While the adequacy of the documentation raises concern, this is not a case like, for example, *Magellan Health Services* or *Johnson Controls*, in which the record revealed differences with respect to the proposals' technical merits and yet the SSA found technical superiority or equality without any explanation.  The documentation and explanation here is adequate to permit the Court to review the merits of the SSA's findings of technical superiority or equality.  In holding that the documentation here is sufficient to explain the SSA's findings of technical superiority or equality, the Court does not mean to suggest that such documentation

and explanation would be sufficient to conduct a proper best-value tradeoff analysis when the SSA must decide whether to select a higher-priced and technically superior proposal.

With respect to the merits of the SSA's best-value determinations, the Court finds that the SSA rationally concluded that the seven lower-priced proposals from offerors 7 (ASM Research), 10 (CACI), 15 (CCSI), 45 (HP), 81 ([***]), 90 (Systems Made Simple), and 91 (SRA International) were technically superior or equal to IBM's proposal.

IBM advances two primary arguments regarding the SSA's findings of technical superiority or equality. First, IBM argues that the past performance factor was "normalized" or "leveled." However, IBM has not shown that its proposal differed qualitatively in terms of risk based on past performance from proposals submitted by other offerors. Second, IBM repeatedly notes that its proposal exceeded DVA's requirement for work to be performed by small business firms and goals for work to be performed by SDB, WOSB, HUB Zone small business, VOSB, and SDVOSB firms by a greater percentage than did these seven offerors' proposals.[11] IBM argues that if the SSA had looked beyond the adjectival ratings for SBPC and the amount of credit for veterans involvement the SSA would have found that IBM's proposal was technically superior to the proposals from offerors 7 (ASM Research), 10 (CACI), 15 (CCSI), 45 (HP), 81 ([***]), 90 (Systems Made Simple), and 91 (SRA International).[12]

Notwithstanding these differences in terms of the extent by which IBM's proposal exceeded DVA's requirement with respect to small business firms generally and goals with respect to specific types of small business firms in particular, the Court cannot conclude that the SSA acted irrationally in finding the other proposals were technically superior or equal to plaintiff's proposal. As illustrated by the color-coded table cited in the SSA's decision, *see supra* Part I.G, all of the seven proposals except IBM's received at least two ratings of "[***]" or better on the individual sample tasks. IBM received two "[***]" ratings and an "[***]" rating. As noted earlier, sample tasks constituted the most important sub-factor under the technical factor, which was significantly more important than past performance. Accordingly, the Court rejects IBM's challenge to the SSA's findings of technical superiority and technical equality.

---

[11] IBM concedes that offeror 90 (Systems Made Simple), which was an SDVOSB firm, may have proposed greater small business and veterans involvement than did IBM. *See* Pl.'s Mot. 26.

[12] The proposals from IBM and offerors 7 (ASM Research), 10 (CACI), 15 (CCSI), and 45 (HP) each received a "[***]" rating for SBPC. IBM's proposal was rated better than offerors 81's ([***]), 90's (Systems Made Simple), and 91's (SRA International) proposals for SBPC, which only received "acceptable" ratings.

IBM's proposal received "minor credit," for veterans involvement, as did proposals from offerors 7 (ASM Research), 10 (CACI), 15 (CCSI), 45 (HP), 81 ([***]), and 91 (SRA International). The proposal from offeror 90 (Systems Made Simple), an SDVOSB firm, received "full credit."

> b.     The SSA's Best-Value Tradeoff Analyses of IBM's Proposal and
>        Offeror 8's (Booz Allen) and Offeror 41's (Harris) Proposals Were
>        Well Documented and Explained

Having rejected IBM's challenge to the awards to offerors 7 (ASM Research), 10 (CACI), 15 (CCSI), 45 (HP), 81 ([***]), 90 (Systems Made Simple), and 91 (SRA International) because the SSA rationally found that the proposals submitted by these seven awardees were technically superior or equal to IBM's proposal, the Court turns to IBM's challenge to the awards to offerors 8 (Booz Allen) and 41 (Harris).  These two awardees proposed prices that were [***] million and [***] million, respectively, higher than IBM's proposed price.  Because these two proposals were *higher-priced* and *technically superior* to IBM's proposal, the SSA was required to conduct best-value tradeoff analyses, which she did.  *See* AR Tab 280, at 83103–08, 83124–28.

As an initial matter, the Court rejects IBM's argument that the SSA's best-value analyses were flawed by DVA's evaluation of IBM's proposed SBPC.  As explained above, DVA did not act irrationally in rating IBM's proposal as "[***]" with respect to SBPC and not finding any significant strengths or additional strengths.

The Court also rejects IBM's argument that the SSA "normalized" or "leveled" the past performance factor.  IBM has not demonstrated that its proposal was in fact superior to the proposals from offerors 8 (Booz Allen) and 41 (Harris) under the past performance factor.  The Court also rejects IBM's argument that the SSA failed to take into account the number of enforceable agreements that IBM had with small business subcontractors and the significant strengths that IBM shared with these two offerors.  The Court previously rejected these arguments when it rejected IBM's claim of a disparate evaluation.

The Court finds that the SSA's best-value tradeoff analyses with respect to proposals from IBM and offeror 8 (Booz Allen), *see* AR Tab 280, at 83103–08, and proposals from IBM and offeror 41 (Harris), AR Tab 280, 83124–28, were well explained, sufficiently documented, and rational.  *See Serco*, 81 Fed. Cl. at 496–97.  This is not a case in which an SSA concluded without explanation that a higher-priced and technically superior proposal was or was not worth the premium.  To the contrary, the SSA, in five- and six-page attachments to the SSD document, compared the proposals to IBM's proposal and thoroughly and rationally explained why the proposals from offerors 8 (Booz Allen) and 41 (Harris) represented the best value to DVA despite the fact that their prices were higher than IBM's proposed price.

While IBM is correct that the SSA did not compare the difference in percentages with respect to work to be performed by small business firms generally and specific types of small business firms in particular, IBM has not demonstrated that it was prejudiced by the SSA's failure to do so.  For example, offeror 8's (Booz Allen) proposal would have still been far superior to IBM's proposal under the technical factor.  Offeror 8's (Booz Allen) proposal received an "outstanding" for the overall technical factor, with "outstanding" ratings for the sample tasks and management sub-factors.  It also received an "outstanding" rating for the SBPC factor.  *See* AR Tab 280, 83096–97.  Similarly, offeror 41's (Harris) proposal was also superior to IBM's proposal under the technical and SBPC factors.  *Id.*

E.       *DVA Conducted Meaningful Discussions*

Under FAR Part 15, when conducting discussions "the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond."[13]  FAR 15.306(d)(3).  Despite this obligation, FAR states that the contracting officer "is not required to discuss every area where the proposal could be improved" and explains that the contracting officer has considerable discretion regarding the contents of the discussions.  *Id.*

Here, IBM challenges DVA's failure to discuss "significant weaknesses" in its sample tasks as required by FAR 15.306(d)(3).  Pl.'s Mot. 33.  However, the Solicitation did not permit DVA to discuss with IBM its sample tasks.  *See* AR Tab 3, at 251.  By not previously challenging this portion of the Solicitation that made clear that DVA could not discuss sample tasks proposals with offerors, IBM has waived the challenge.  *Blue & Gold*, 492 F.3d at 1313.

IBM's remaining challenge is that DVA failed to inform IBM that it "(1) [would] g[i]ve great weight to 'bilateral' agreements, an undefined term that is not included as an evaluation factor in the solicitation; and (2) . . . would use pass/fail evaluation criteria for all non-veteran[-] owned businesses."  Pl.'s Mot. 33–34.  IBM has merely recast its previously rejected claims that the SSA engaged in disparate treatment with respect to the SBPC factor and improperly introduced a new factor into the evaluation of veterans involvement as claims with respect to discussions.  For the reasons stated earlier, the Court rejects those claims.

## CONCLUSION

Based on the foregoing, the Court **DENIES** IBM's motion for judgment on the administrative record and **GRANTS** defendant's and defendant-intervenor HP's cross-motions for judgment on the administrative record.  The Clerk shall enter judgment accordingly.

Some information contained herein may be considered protected information subject to the protective order entered in this action on August 31, 2011 (docket entry 25).  This Opinion and Order shall therefore be filed under seal.  The parties shall review the Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the protective order prior to publication.  The Court **FURTHER ORDERS** that the

---

[13] Additionally, the FAR "encourage[s]" contracting officers to include in their discussions other aspects of a proposal at issue that could, if amended or explained, increase the likelihood that the proposal will result in an award.  FAR 15.306(d)(3).

parties shall file, by **Monday, November 28, 2011**, a joint status report identifying the information, if any, they contend should be redacted, together with an explanation of the basis for each proposed redaction.

      **IT IS SO ORDERED.**

_____ s/ George W. Miller _____
GEORGE W. MILLER
Judge
